**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | :     CRIMINAL NO. 19-639 |
| THOMAS WHALEN | : |

**GOVERNMENT'S SENTENCING MEMORANDUM**

## I. INTRODUCTION

On December 16, 2019, the defendant, Thomas Whalen, pleaded guilty to a four-count Information charging him with one count of health care fraud, in violation of 18 U.S.C. § 1347, one count of importation contrary to law, in violation of 18 U.S.C. § 545, and two counts of knowingly and intentionally distributing and dispensing oxycodone, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). On September 15, 2020, Whalen is set to appear before this Court to be sentenced for these offenses.

Whalen, a licensed rheumatologist during the commission of these crimes, abused his education, training, and position for his own personal benefit. From in or about January 2014 until in or about March 2018, Whalen fraudulently billed Medicare, the United States Office of Personnel Management ("OPM"), and Independence Blue Cross insurance company ("IBC") for FDA-approved injectable medications Remicade (infliximab), Orencia (abatacept), Prolia/Xgenva (denosumab), Synvisc/Synvisc One (hyaluronan), and Boniva (ibandronate sodium), despite purchasing and injecting his patients with cheaper, foreign, non-FDA approved variants of these drugs.

Whalen also prescribed oxycodone to two patients that he knew abused illicit drugs, including cocaine and heroin. Between January 2016 and April 2018, Whalen prescribed

approximately 3,765 oxycodone pills to these patients, despite their repeated, positive urine drug test results for street narcotics.

The U.S. Probation Office accurately calculated Whalen's advisory Sentencing Guidelines range as 46 to 57 months. Given the severity of Whalen's crimes—which include fraud in excess of $1.1 million and the potential harm to the community of introducing powerful and deadly painkillers onto the streets—a Guidelines sentence is appropriate.

## II. FACTUAL SUMMARY

From in or about January 2014 to in or about March 2018, Whalen, a doctor of osteopathic medicine in the Commonwealth of Pennsylvania and the State of Delaware, engaged in a scheme to defraud wherein he imported into the United States foreign, non-FDA approved injectable medications and falsely billed Medicare, OPM, and IBC by submitting claims for those injectable medications as if they were the FDA-approved versions. From January 2014 to March 2018, Whalen billed Medicare, OPM and IBC a total of approximately $2.3 million and was paid approximately $1.1 million for the provision of injectable medications, despite using cheaper, foreign, non-FDA approved substitutes. Rather than purchase Remicade, Synvisc, Synvisc-One, Orencia, Prolia/Xgeva, or Boniva from authorized distributors, Whalen purchased non-FDA approved versions of these injectable medications from suppliers outside of the United States. Then, unbeknownst to his patients, Whalen injected or infused them with non-FDA approved variations of these medicines at his offices in the Eastern District of Pennsylvania. The defendant benefited from this scheme because the cost of injectable medications are reimbursed directly to the rendering physician by Medicare, OPM, and IBC. By billing for FDA-approved drugs while supplying cheaper, foreign substitutes, Whalen pocketed the profits without regard to patient risk.

Whalen also knowingly and intentionally prescribed controlled substances outside the usual course of professional practice and without a legitimate medical purpose. Whalen prescribed Schedule II controlled substances to patients despite receiving aberrant urine drug test results for those patients. The test results included positive results for illegal or illicit drugs, including cocaine and heroin, and negative results for the Schedule II controlled substances that Whalen prescribed. For the two patients identified in the Information, whose identities are known to the government and to defendant, Whalen continued to prescribe Schedule II controlled substances outside the course of professional practice and not for a legitimate medical purpose.

Whalen received patient J.J.'s first positive drug test in January 2016, yet continued to prescribe oxycodone, and other narcotics, up to and including April 2018, on seventeen occasions. During this same period, Whalen received eight urine screening test results showing J.J. had taken illicit drugs. Similarly, Whalen received patient D.M.'s first positive drug test in October 2016, yet continued to prescribe oxycodone up to and including September 2017, on nine occasions. During this same period, Whalen received four urine screening test results showing D.M. had taken illicit drugs. For these two patients alone, Whalen issued and caused to be issued at least 33 prescriptions for oxycodone, the total weight for which was 53.26 grams. Oxycodone is a Schedule II controlled substance.

### III.   SENTENCING CALCULATION

#### a. Statutory Maximum Sentence

For a violation of 18 U.S.C. § 1347, the maximum statutory sentence is 10 years' imprisonment, a $250,000 fine, 3 years of supervised release, and a $100 mandatory special assessment.

For a violation of 18 U.S.C. § 545, the maximum statutory sentence is 20 years' imprisonment, a $250,000 fine, 3 years of supervised release, and a $100 mandatory special assessment.

For a violation of 21 U.S.C. § 841(a)(1), the maximum statutory sentence is 20 years' imprisonment, a $1,000,000 fine, 3 years of supervised release, and a $100 mandatory special assessment.

Thus, the total maximum penalties are 70 years' imprisonment, a $2,500,000 fine, up to three years of supervised release, full restitution, forfeiture, and a $400 special assessment.

### b. Sentencing Guidelines Calculation

The government concurs with the Sentencing Guidelines as calculated by Probation. Probation has prepared a PSI Report that accurately calculated the advisory Sentencing Guidelines that apply to the defendant, and the government agrees that the defendant's final offense level is 23, calculated as follows:

i. <u>Count 1: Health care fraud and aiding and abetting</u>

   a. Base Offense Level. Pursuant to U.S.S.G. §§ 2B1.1(a)(2), the base offense level for a violation of 18 U.S.C. § 1347 is 6.

   b. Specific Offense Characteristics. Pursuant to U.S.S.G. § 2B1.1(b)(1)(H), Whalen is responsible for the actual loss of $1,116,845.02, which is the amount he was paid by Medicare, OPM, and IBC for non-FDA approved medications. Accordingly, 14 levels are added when the loss is more than $550,000, but not more than $1,500,000 and establishes a base offense level of 20.

      c. Adjustment for Role in the Offense. Pursuant to U.S.S.G. § 3B1.3, the offense level is increased by two points because the defendant—a physician—possessed a skill not held by members of the general public which required substantial education, training, and licensing. He also maintained a trust with his patients and the medical community. But Whalen abused that position of trust when he injected his patients with non-FDA approved pharmaceutical drugs, and billed federal and private health care programs as if those drugs were FDA-approved. This enhancement establishes an offense level of 22.

  ii. <u>Count 2: Importation contrary to law and aiding and abetting</u>

      a. Base Offense Level: Pursuant to U.S.S.G. § 2T3.1(a)(1), the base offense level for a violation of 18 U.S.C. § 545 is 4.

      b. Adjustment for the Role in the Offense: Pursuant to U.S.S.G. § 3B1.3, the offense level is increased by two points because the defendant—a physician—possessed a skill not held by members of the general public which required substantial education, training, and licensing. He also maintained a trust with his patients and the medical community. Whalen abused that position of trust when he unlawfully imported non-FDA approved drugs into the United States as part of his health care fraud scheme. This enhancement establishes an offense level of 6.

  iii. <u>Count 3: Unlawful distribution of a controlled substance</u>

      a. Base Offense Level: Whalen was responsible for the distribution of 53.26 grams of oxycodone, which was the equivalent of 356.842 kilograms of marijuana. Pursuant to U.S.S.G. § 3D1.2, counts involving "substantially the

5

       same harm shall be grouped together into a single Group." Pursuant to U.S.S.G. §§ 2D1.1(a)(5) & 2D1.1(c)(8), this conduct establishes an offense level of 24.

   b. Specific Offense Characteristics: Whalen has met the criteria in U.S.S.G. § 5C1.2(a)(1)-(5) regarding limitation on applicability of statutory minimum sentences in certain cases—the "safety valve" reduction. Eligibility for the "safety valve" reduces Whalen's offense level by 2 points, U.S.S.G. § 2D1.1(b)(18), and establishes an offense level of 22.

   c. Adjustment for Role in the Offense. Pursuant to U.S.S.G. § 3B1.3, the offense level is increased by two points because the defendant—a physician—possessed a skill not held by members of the general public which required substantial education, training, and licensing. He also maintained a trust with his patients and the medical community. Whalen abused that position of trust when he prescribed oxycodone outside the usual course of professional practice and without a legitimate medical purpose to patients who Whalen knew were diverted their prescriptions to obtain illegal narcotics. This enhancement establishes an offense level of 24.

  iv. <u>Multiple Count Adjustments</u>

   a. Pursuant to U.S.S.G. § 3D1.4(a), each Group of offenses is assigned a unit. Here, Whalen is assigned two units, one for his health care fraud and a second for his two distribution of a controlled substance offenses.[1] Pursuant to

---

[1] Pursuant to U.S.S.G. § 3D1.4(c), Whalen's second count for importation contrary to law and aiding and abetting is disregarded because it "is 9 or more levels less serious than the Group with the highest offense level."

6

        U.S.S.G. § 3D1.4(a), those two units add two offense level points to Whalen's highest total offense level of 24, placing him at an offense level of 26.

    b. **Acceptance of Responsibility.** Pursuant to U.S.S.G. §§ 3E1.1(a) and (b), the offense level is reduced by a total of three points for acceptance of responsibility (- 2 levels); and timely notification to authorities of his intent to plead guilty (- 1 level).

This results in a total offense level of 23. Whalen's criminal history score is zero, resulting in Category I. Thus, Whalen's Guidelines range would be 46 months to 57 months of imprisonment.

## IV. ANALYSIS OF SENTENCING FACTORS

### a. Legal Standard

After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines have only advisory force, and the Court of Appeals for the Third Circuit has thus interpreted *Booker* to require the following three steps:

    (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

    (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

    (3) Finally, they are required to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless of whether it varies from the sentence calculated under the Guidelines.

7

*United States v. Charles*, 467 F.3d 828, 830–31 (3d Cir. 2006) (citations omitted).

### b. A Sentence within the Guidelines Range is Warranted

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses. Here, as noted above, the Guidelines yield an advisory range of 46 to 57 months' incarceration. For the reasons set forth below, and after consideration of the 18 U.S.C. § 3553(a) factors, it is the government's position that the defendant should be sentenced to a term of imprisonment within that Guidelines range.

### i. Nature of the Offense and Characteristics of the Defendant

Health care fraud is a serious offense that targets a national program relied on by millions of Americans. Congress aptly summarized the effects of the defendant's crime over thirty years ago:

> In whatever form it is found . . . fraud in these health care financing programs adversely affects all Americans. It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program. It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services.

H.R. 95-393, pt. II, at 44 (1977). *See also* H.R. Rep. 104-747 (1996) ("Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures.").

8

The defendant, a doctor who completed medical school, opened a private medical practice, and treated patients for decades, chose to abuse the trust that our society places in doctors by stealing from a public health care program. In committing health care fraud and importation contrary to law, Whalen placed his own financial greed over patient care when he purchased cheaper, non-FDA approved medications to increase his profit margin. Whalen knowingly imported cheaper, foreign, and non-FDA approved variants of the injectable medications Remicade, Orencia, Prolia/Xgenva, Synvisc/Synvisc One, and Boniva. Then, he fraudulently billed Medicare, OPM, and IBC for FDA-approved versions of these injectable medications, despite injecting or infusing his patients with the foreign, non-FDA approved medications. As a result of his fraudulent scheme, Whalen reaped profits of over $1.1 million.

Moreover, as a trained, educated, and experienced doctor who worked for decades with patients experiencing pain, Whalen knew the health risks that oxycodone posed to the community at large. Nonetheless, he unlawfully distributed deadly painkillers to two patients despite repeated evidence of their drug division and consumption of illicit street drugs. Whalen's actions contributed to the dire public health crisis gripping this district and the nation by distributing oxycodone without a legitimate medical purpose. Accordingly, he should receive a within-Guidelines sentence for his illicit conduct.

### ii. The Need to Reflect the Seriousness of the Crime, to Promote Respect for the Law, and to Provide Just Punishment

Whalen's crimes—borne of greed and dishonesty— were intentional and serious. Using his privilege as a doctor, licensed to practice medicine, Whalen orchestrated a scheme to pilfer funds from federal health care programs and a private insurance company. His devious efforts stretched beyond short lapses in judgment. Rather, Whalen's ploy lasted years in which he knowingly and repeatedly placed orders for foreign medication, rather than order from

9

authorized distributors within the United States, to reduce his own costs while ensuring that his victims paid for the more expensive drugs he purported to use. Whalen's use of non-FDA medications risked harm to patients. But the scheme netted Whalen more than $1.1 million, which he used to fund an expensive lifestyle, including purchase of a vacation home, a boat, and exorbitant salaries paid to his children, who did not actually work at his medical office.

Whalen also distributed, outside the course of professional practice and not for a legitimate medical purpose, 3,765 pills of oxycodone at high dosage levels, during a time when our nation is facing an opioid epidemic. Since 1999, the number of drug overdose deaths has skyrocketed nationally, from 16,849 in 1999 to 70,237 in 2017.[2] Opioid deaths represent more than 60% of all drug overdose related deaths in the United States.[3] The opioid epidemic is a particular problem in the Commonwealth of Pennsylvania. In 2017, Pennsylvania had one of the highest rates of death due to drug overdoses (44.3 per 100,000 people).[4] A sentence within the Guidelines range will appropriately reflect the seriousness of *all* of Whalen's criminal acts.

### iii.   The Need to Provide General and Specific Deterrence

The need for general deterrence also weighs heavily in favor of a Guideline sentence. 18 U.S.C. § 3553(a)(2)(B) and (C). Fraud schemes like Whalen's are typically difficult to detect and prosecute, so there is a greater need for general deterrence. *See, e.g., Harmelin v. Michigan*, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to

---

[2] *See* Centers for Disease Control and Prevention – National Center for Health Statistics (CDC – NCHS), "Drug Overdose Deaths in the United States, 1999-2017," *available at* https://www.cdc.gov/nchs/data/databriefs/db329_tables-508.pdf#page=1.

[3] *See* National Institute of Health – National Institute on Drug Abuse, "Overdose Death Rates," *available at* https://www.drugabuse.gov/related-topics/trends-statistics/overdose-death-rates.
[4] *See* Centers for Disease Control and Prevention, "Drug Overdose Death," *available at* https://www.cdc.gov/drugoverdose/data/statedeaths.html.

10

detect may warrant substantially higher penalties"). Moreover, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *See, e.g., United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, *White–Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

Congress recognized the need to afford adequate deterrence as "particularly important in the area of white collar crime" when it adopted Section 3553. *See* S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259. Congress rightly was disturbed that "white collar criminals often are sentenced to small fines and little or no imprisonment," and noted that, "[u]nfortunately, this creates the impression that certain offenses . . . can be written off as a cost of doing business." *Id*. In adopting the Section 3553 sentencing factors, Congress emphasized the essential deterrent value of imprisoning white collar criminals, even when those criminals themselves might be unlikely to reoffend:

> The Committee is of the view that in the past there have been many cases, particularly in the instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized

11

> rehabilitative measures . . . and because society required no
> insulation from the offender, without due consideration being
> given to the fact that the heightened deterrent effect of
> incarceration and the readily perceivable receipt of just punishment
> accorded by incarceration were of critical importance. The placing
> on probation of [a white collar criminal] . . . may be grossly
> inappropriate . . . in cases in which the circumstances mandate the
> sentence's carrying substantial deterrent or punitive impact.

*Id*. at 91-92.

Whalen's punishment should take into account the need to deter other doctors from stealing from health care programs. Health care fraud is a serious problem that has warranted national law enforcement attention. Although federal law provides significant periods of incarceration for those who steal from these programs, this fraud continues at alarmingly high rates. In determining a just sentence, the Court should consider the need to promote respect for the criminal fraud laws. Here, a sentence within the Guidelines range will serve to deter doctors, and other medical professionals, who, like the defendant, may be tempted to place their financial interests above all else. A within Guidelines sentence will also afford adequate deterrence against medical professionals, like Whalen, who abused their privileges to unlawfully distribute oxycodone to patients already reeling from the effects of the opioid epidemic.

### iv. The Need to Provide the Defendant with Training, Medical Care, or Other Correctional Treatment

Whalen holds a doctorate of osteopathic medicine and he was a licensed physician at the time of the commission of the offenses. According to Probation's presentence investigation report, he graduated from the Philadelphia College of Osteopathic Medicine in 1979.

### v. The Sentencing Commission's Guidelines and Policy Statements

Pursuant to U.S.S.G. § 1B1.2, the defendant stipulated that he committed health care fraud and deprived Medicare, OPM, and IBC of more than $550,000, but not more than

$1,500,000 in violation of 18 U.S.C. § 1347. Under U.S.S.G. § 3D1.2(b), this conduct is grouped with the conduct charged in Count 1 of the Information, and under U.S.S.G. § 3D1.3(a), the higher offense level of the grouped counts controls. Under U.S.S.G. § 3D1.4(a), Whalen's highest offense level (here, two counts of knowingly and intentionally distributing and dispensing, outside the course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone) increases by two points to account for the one count of health care fraud. After accounting for his acceptance of responsibility and his timely notification to the government of his intent to plead guilty, Whalen's offense level is a 23.

### vi. The Need to Avoid Unwarranted Sentencing Disparities

The need to avoid unwarranted sentencing disparities may be achieved through the careful calculation and review of the Guidelines range. *See, e.g.*, *Gall*, 552 U.S. at 54 ("Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities.").

### vii. The Need to Provide Restitution

Whalen must pay restitution of $1,116,845.02. During the scheme, Whalen was paid the following amounts by the three victims:

Medicare: $832,662.15
    U.S. Centers for Medicare & Medicaid Services
    7500 Security Boulevard
    Baltimore, MD 21244

IBC: $259,345.32
    ATTN: Bob Climaldi
    1901 Market Street, 42nd Floor
    Philadelphia, PA 19103

OPM: $24,837.55
    U.S. Office of Personnel Management

        900 Market Street, Suite 600
        Philadelphia, PA 19107

Whalen is in the process of negotiating a civil settlement agreement with the Civil Division of the U.S. Attorney's Office. Any restitution amount allocated in the civil agreement will be applied towards the criminal restitution amount owed to federal health care plans.

## V.   CONCLUSION

Accordingly, for the reasons stated above, the government respectfully recommends a sentence within the advisory Guidelines range of 46 to 57 months' imprisonment, followed by three years of supervised release, and a $400 special assessment.

                                                      Respectfully submitted,

                                                    WILLIAM M. MCSWAIN
                                                    United States Attorney


                                                   /s/ Paul J. Koob
                                                  PAUL J. KOOB
                                                  Assistant United States Attorney

                                                 /s/ Debra Jaroslawciz
                                                 DEBRA JAROSLAWICZ
                                                 DOJ Trial Attorney

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Government's Sentencing Memorandum was served upon the following by electronic filing:

William Brennan, Esq.
Brennan Law Offices
1600 Locust Street
Philadelphia, PA 19103
Brennanlaw@philadelphiacriminallaw.com

Ronald H. Levine, Esquire
Post & Schell, P.C.
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103
rlevine@postschell.com

/s/ Paul J. Koob
Paul J. Koob
Assistant United States Attorney

Dated: September 8, 2020